# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# WACO DIVISION

| | |
|---|---|
| **SHENZHEN LAIBO TECHNOLOGY CO., LTD.,** *et al.*, <br><br>             *Plaintiffs and Counterclaim-Defendants*, <br><br>     v. <br><br> **XEBEC, INC.,** <br><br>             *Defendant and Counterclaim Plaintiff.* | **Civil Action No. 6:22-cv-00001-ADA** |

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

Pursuant to the Scheduling Order (Dkt. No. 25), Plaintiffs and Counter-claim Defendants Shenzhen Laibo Technology Co., Ltd., *et al.* ("Plaintiffs"), file its Opening Claim Construction Brief.

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................ 1

II.     APPLICABLE LEGAL PRINCIPLES ............................................................................ 1

III.    A PERSON HAVING ORDINARY SKILL IN THE ART ............................................. 4

IV.     THE ASSERTED PATENTS ............................................................................................. 4

V.      THE CLAIM TERMS AT ISSUE .................................................................................... 6

VI.     DISPUTED CLAIM TERMS ............................................................................................ 6

    A.  "HUNG" ........................................................................................................................ 6

    B.  "bracket" .................................................................................................................... 10

    C.  "FOR Engagement" .................................................................................................. 13

    D.  "engaged with and slidable / in sliding engagement" ....................................... 15

    E.  "coupled to" .............................................................................................................. 17

VII.    CONCLUSION ................................................................................................................. 19

## TABLE OF AUTHORITIES

*Alloc, Inc. v. Int'l Trade Comm'n,*
 342 F.3d 1361, 1368 (Fed. Cir. 2003) ........................................................................... 2

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.,*
 262 F.3d 1258, 1267 (Fed. Cir. 2001) ........................................................................... 2

*C.R. Bard, Inc. v. U.S. Surgical Corp.,*
 388 F.3d 858, 861 (Fed. Cir. 2004) .............................................................................. 2

*Comark Commc'ns, Inc. v. Harris Corp.,*
 156 F.3d 1182, 1187 (Fed. Cir. 1998) ........................................................................... 3

*Constant v. Advanced Micro-Devices, Inc.,*
 848 F.2d 1560, 1571 (Fed. Cir. 1988) ........................................................................... 3

*Envtl. Designs, Ltd. v. Union Oil Co. of California,*
 713 F.2d 693 (Fed. Cir. 1983) ....................................................................................... 4

*Home Diagnostics, Inc. v. Lifescan, Inc.,*
 381 F.3d 1352, 1356 (Fed. Cir. 2004) ........................................................................... 3

*Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.,*
 381 F.3d 1111, 1115 (Fed. Cir. 2004) ........................................................................... 1

*Markman v. Westview Instruments, Inc.,*
 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 S. Ct. 1384, 134 L.
 Ed. 2d 577 (1996) ...................................................................................................... 1, 2

*Phillips v. AWH Corp.,*
 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ...................................................... 1, 2, 3

*Standard Oil Co. v. Am. Cyanamid Co.,*
 774 F.2d 448, 452 (Fed. Cir. 1985) .............................................................................. 3

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
 299 F.3d 1313, 1325 (Fed. Cir. 2002) ........................................................................... 2

*Teva Pharm. USA, Inc. V. Sandoz, Inc.,*
 574 U.S. 318, 135 S. Ct. 831, 841 (2015) ...................................................................... 1

*Vitronics Corp. v. Conceptronic, Inc.,*
 90 F.3d 1576, 1582 (Fed. Cir. 1996) ............................................................................. 2

## I.      INTRODUCTION

There are a total of five terms across two patents presented for construction in this matter. Plaintiffs proposed constructions are in accordance with the ordinary and customary meaning that a person of ordinary skill in the art would have understood the claim language to have at the time of invention in light of the intrinsic and extrinsic evidence. In contrast, Defendant seeks to improperly expand the scope of the terms under the guise of plain and ordinary meaning in an attempt to justify their creative infringement theories in violation of bedrock claim construction principles. Accordingly, the Court should adopt Plaintiffs' proposed constructions to disallow Defendant from presenting unsupported arguments to the lay jury.

## II.     APPLICABLE LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. V. Sandoz, Inc.*, 574 U.S. 318, 135 S. Ct. 831, 841 (2015) (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id*. (citing 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312-13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314-15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. The

specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a

3

term's definition are entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

## III.    A PERSON HAVING ORDINARY SKILL IN THE ART

The Federal Circuit has set out a number of factors a court should consider in determining the level of ordinary skill in the art, including: (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field. *Envtl.  Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696-97 (Fed. Cir. 1983).  In any given case, not all such factors may be present, and one or more factors may predominate over another.  *Id*.

Plaintiffs contend that a person having ordinary skill in the art of accessory display devices and mounting systems (a "POSITA") would have at least: (1) a bachelor's degree in mechanical engineering, electrical engineering, or a related field, or the equivalent; and (2) at least two years of field experience in the area of: computer product design, specifically in the engineering and design of portable computer screens, or the equivalent.

## IV.    THE ASSERTED PATENTS

### A.    The '757 Patent

U.S. Patent No. 9,395,757 ("the '757 Patent" – Attached as Exhibit A), issued on July 19, 2016, discloses an auxiliary screen mounting system.  The '757 Patent contains nineteen total claims including independent claim 1.

An objective of the '757 Patent was to provide an auxiliary screen support system for which one or more of the problems of the prior art, including complexity, time consuming to attach, and prone to degradation, is at least partially mitigated. *See* '757 Patent, 1:37-50. To those ends, the '757 Patent discloses "[a]n auxiliary screen support system for a computing device with mounting

4

members arranged to be disposed on opposing lateral sides of a primary screen of the computing device in use. A retaining member extends between the mounting members, and is configured to hold the mounting members relative to the opposing lateral sides of the primary screen. At least one mounting member is configured to bear an auxiliary screen such that the auxiliary screen is hung relative to the primary screen in use. One or both mounting members may be formed as a unitary, rigid body and may be configured to hold an auxiliary screen at a fixed obtuse angle relative to a primary screen of the computing device." *See Id.,* at Abstract.

   **B.     The '762 Patent**

   U.S. Patent No. 10,809,762 ("the '762 Patent" – Attached as Exhibit B), issued on October 20, 2020, discloses an auxiliary display device.  The '762 Patent contains twenty total claims including independent claims 1, 9 and 16.

   The '762 Patent discloses an accessory display device including "a housing having a first side and a second side movable relative to one another and a first pair of rails coupled to the first side and a second pair of rails coupled to the second side, the first pair of rails engaged with and slidable relative to the second pair of rails." *See* '762 Patent at Abstract.  "The device also includes a tensioning member coupled to the first side and the second side and placing tension between the first side and second side. Further, the device includes a first engagement portion coupled to the first side and a second engagement portion coupled to the second side. The first engagement portion and the second engagement portion are configured to engage the side of a computer's display under force created by the tensioning member.  Further still, a first display is slidable within the housing and is movable from a stowed position to a use position." *Id.* at Abstract.

## V.     THE CLAIM TERMS AT ISSUE

Defendant alleges Plaintiffs of infringing claim 1-6, 10, 11 and 15 of the '757 Patent and claims 1-4, 8-13, and 15 of the '762 Patent. The terms at issue stem from claims 1, 3, 4, and 15 of the '757 Patent and claims 1 and 9 of the '762 Patent, as identified below with the accompanying preliminary proposed constructions.

| Patent | Term | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| '757 | hung | fastened from above with no support from below; suspended | Plain and ordinary meaning |
| '757 | a bracket | a structure in the shape of an L adapted to support a load | Plain and ordinary meaning |
| '757 | for engagement | for interlocking or meshing under the action of friction and/or gravity in use | Plain and ordinary meaning |
| '762 | engaged with and slidable / in sliding engagement | interlocked or meshed with and capable of sliding | connected and slidable |
| '762 | coupled to | directly connected to | Plain and ordinary meaning |

## VI.    DISPUTED CLAIM TERMS

### A.     "HUNG"

| Plaintiffs | Defendant |
|---|---|
| fastened from above with no support from below; suspended | Plain and ordinary meaning |

The Court should adopt Plaintiffs' proposed construction for the term "hung" because it is in accordance with the ordinary and customary meaning in view of the intrinsic and extrinsic evidence.  While Defendant purports to that no construction is necessary, the Court should construe this term to prevent Defendant from advancing infringement theories to a juror contrary to the

ordinary and customary meaning as it has already done so in its infringement contentions.  As discussed herein, Plaintiffs' proposed construction is in accordance with the spirit of the invention and disclosed embodiments.[1]

The term "hung" is found in claim 1, which states: "…at least one mounting member is configured to bear an auxiliary screen such that the auxiliary screen is *hung* relative to the computing device in use…" (emphasis added). The claim language tracks the embodiment in Figure 8: at least one mounting member (12) is configured to bear an auxiliary screen (screen housing 40) hung (by the portions in red) relative to the computing device (60).



Figure 8

The term "hung" is not explicitly defined in the specification.  However, the patentee uses the term "hang" in reference to the support system hanging or suspended on the computing device: "The support system may be configured and/or shaped to hang on a primary screen of a portable computing device, e.g. at least partly under the action of gravity. The partially or substantially

---

[1] While the specification discloses nonmaterial variations, all disclosed embodiments show that the screen is fastened from above with no support from below. The only variances in the embodiments in the specification envisions swapping the slot/recess on the mounting member and the projection on the auxiliary screen while still achieving the desired function. *See* '757 Patent, 9:54-61.

enclosed volume of each of the plurality of mounting members may have a shape that allows the support system to hang on a primary screen of a portable computing device, e.g. at its vertices." *Id.* at 3:63-4:3. The emphasis in the invention on the screen being hung or suspended by gravity is consistent in the specification.

The specification goes on to state, "[a]n auxiliary screen (screen housing 40) may be mounted relative to the primary screen (62) of a portable computing device (60) by engagement between the projection (42) and the mounting member (12)." '757 Patent at 4:50-52 (annotated). Throughout the '757 Patent, the inventor unambiguously discloses that the auxiliary screen is mounted, *i.e.*, hung, relative to the primary screen via engagement between the projection and mounting member, as shown by the red ovals above.

The specification goes on to further describe this mounting engagement as the interaction between the slot of the second portion of the mounting member and the projection of the screen housing. For example, "The mounting member 12 comprises first 16 and second 18 portions." 5:48-49. "The second portion 18 comprises a screen receiving formation in the shape of a recess or slot 26." 6:24-25. "The screen receiving slot 26 is dimensioned so as to receive a corresponding projection of a screen housing…" 6:28-30. "Thus at least two of the plurality of projections 42 of the screen housing 40 is capable of being received by each screen receiving slot 26 of the auxiliary screen mounting system 10." 7:51-54.

**Figure 3**



**Figure 7**



As such, in the '757 Patent the term "hung" also relates to the mounted interaction between the recess/slot (26) of the mounting member (12) and the projection (42) of the auxiliary screen (40) such that the auxiliary screen is hung, *i.e.*, suspended or fastened from above with no support from below or suspended, relative to the computing device (60).

9



Figure 9

In addition, Figure 9 again shows that two screens are suspended above in either portrait or landscape mode in the "in an alternative usage configuration." *Id.* at 5:33-34; 9:49-53.

Plaintiffs' proposed construction is also in line with the objective of the '757 Patent: to provide an auxiliary screen support system that mitigates the problems of the prior art. *Id.* at 1:48-50. The '757 Patent explicitly distinguishes over several prior art patents which disclose secondary computing device display systems that employ complex clamping mechanisms which can be time consuming to attach. *Id.* at 1:37-44.  To those ends, the '757 Patent employs a hanging auxiliary screen that is easily attached and removed.  Therefore, any construction or interpretation of "hung" which permits fixedly connected is at plain odds with the stated objective of the '757 Patent and against the plain and ordinary meaning.

Moreover, such a construction is in accord with the extrinsic evidence. For example, "hang" is defined as "to fasten from above with no support from below; suspend." *Hang*, The American Heritage Dictionary. (2nd ed. 1991).  *See "Hang"* Exhibit C –Pg. 5 (Laibo-000410),

**B.    *"BRACKET"***

| Plaintiffs | Defendant |
|---|---|
| a structure in the shape of an L adapted to support a load | Plain and ordinary meaning |

The Court should adopt Plaintiffs' proposed construction for the term "bracket" because it is in accordance with the ordinary and customary meaning in view of the intrinsic and extrinsic evidence. Again, the Parties largely differ on what exactly the plain and ordinary meaning is, with Plaintiffs offering a construction and Defendant defaulting to no construction. However, Plaintiffs' proposed construction is in accordance with the spirit of the invention in the '757 Patent.

The term "a bracket" is found in claim 4, reproduced in part: "…wherein one or both mounting members take the form of *a bracket* having a first portion for engagement with the portable computing device and a second portion depending from the first portion for bearing the auxiliary screen." (emphasis added). The claim language tracks the embodiment of Figure 3: the mounting member (12) is a bracket with a first portion (16) for engagement with the computing device (60) and a second portion (18) depending from the first portion for bearing the auxiliary screen (40).

*Figure 3*



Each use of the term "bracket" in the '757 Patent is consistent with and necessitates the proposed construction. For example, "The plurality of mounting members may have the form of

brackets. The brackets may comprise first and second portions. The first and second portions may be angled, e.g. obliquely angled, relative to one another. The angle between the first and second portions may be in the range of 120-180 degrees. This angle thereby provides a suitable angle for viewing an auxiliary screen, e.g. relative to a primary screen, when it is supported by a mounting member." *Id.* at 2:12-19.

The first and second portions are further defined in the detailed description. For example: "The first 16 and second 18 portions are integrally formed, and are obliquely angled, typically at an obtuse angle relative to one another. The internal angle there-between may be greater than 135 degrees or 140 degrees and in this example is approximately 160 degrees. The angle defines an orientation of an auxiliary screen relative to a primary screen in use…" *Id.* at 5:57-62. Figure 5 brings the first (16) and second (18) portions of the L-shaped bracket (12) to life:



*Figure 5*

Therefore, the proper construction in view of the disclosed embodiments in the specification defines the scope of the term "a bracket" as a structure in the shape of an L adapted to support a load having a first portion (16) for engagement with the portable computing device (60) and a second portion (18) depending from the first portion for bearing the auxiliary screen (40).

12

Moreover, such a construction is in accord with the extrinsic evidence. For example, the term "bracket" is defined as "a simple rigid structure in the shape of an L, one arm of which is fixed to a vertical surface, the other projecting horizontally to support a shelf or other weight; a wall-anchored fixture adapted to support a load." *See "Bracket"* Exhibit C –Pg. 6 (Laibo-000411),

### C.   *"FOR ENGAGEMENT"*

| Plaintiffs | Defendant |
|---|---|
| for interlocking or meshing under the action of friction and/or gravity in use | Plain and ordinary meaning |

Here, Plaintiffs propose a construction of the terms "for engagement" in accordance with its ordinary and customary meaning in view of the intrinsic and extrinsic evidence.  Tellingly, although Defendant does not proffer a construction of "for engagement" in the '757 Patent, it proposes a construction of "engaged/engagement" in the '762 Patent as merely "connected." Defendant's proposed construction in the '762 Patent gives away its hand that under its "plain and ordinary meaning" it would have "for engagement" in the '757 Patent be broad enough to be merely "connected" which clearly goes against what is the '757 specification.   As such, a construction is necessary to prevent Defendant from taking such a position to the jury.

The '757 Patent uses the term "engagement" synonymously with "engagement formation" (e.g. "such as a groove, channel or striation…..").  *Id.* at 2:48-50.  Additionally, the '757 Patent provides an example such as "[t]he spine portion may be adapted to engage the vertices of a variety of portable computing devices."  *Id.* at 2:63-65.  "The screen housing may comprise a projection arranged to releasably engage with a mounting member of the screen support system."  *Id.* at 4:20-22.  "An auxiliary screen may be mounted relative to the primary screen of the portable computing device by engagement between the projection and the mounting member." *Id.* at 4:50-52.  This is also shown in every embodiment in the figures.



The specification further states that "[i]t is notable that the engagement between the projections 42 and the receiving formation 26 on the mounting member…" *Id.* 9:44-45. As such, the '757 Patent refers to "engagement" as requiring interlocking or meshing together of 2 compatible components.



Figure 8

As further evidence that engagement refers to interlocking or meshing, the '757 Patent goes on to define what **is not** engagement by stating "[t]he primary screen 62 is received within a channel with a close fit, but without any latching or engagement action such that the mounting system is mechanically simple and cost effective." *Id.* at 8:67-9:3. This specification makes clear that although the mounting system is attached to the primary screen 62, this is not engagement.

14

Instead, "opposing mounting members 12 are held laterally upon the primary screen 62 by the tension provided by retaining member 14…" *Id.* at 9:4-6.

As such, the Court should adopt Plaintiffs proposed construction that "for engagement" requires interlocking or meshing under the action of friction and/or gravity in use.

### D. "ENGAGED WITH AND SLIDABLE / IN SLIDING ENGAGEMENT"

| Plaintiffs | Defendant |
|---|---|
| interlocked or meshed with and capable of sliding | connected and slidable |

Similarly to "for engagement" in the '757 Patent, the terms "engaged with and slidable/in sliding engagement" is used in the '762 Patent in an analogous context. Plaintiffs propose a construction for the terms consistent with their ordinary and customary meanings in view of the intrinsic and extrinsic evidence.

The '762 Patent discusses these terms primarily in the context of the interlocked first pair of rails and second pair of rails as shown and discussed below.



FIG. 3

FIG. 8

Referring now to FIG . 8, an end view of the rails 185 and 195 of the left portion 175 of the housing 130 is depicted. Male rail 195 includes two guides that run along the length of rail 810. Guides 810 engage with female rail 190 which has a female cross -section similar to the female cross-section of rail 185. Rail 185 is depicted with a pair of opposing notches 820 that run along rail 185 and are configured to engage guides on male rail 180 like guides 810 of rail 195. The use of a combination of guides and complementary notches on rails 185 and 180 and similarly rails 195 and 190 allows for accurate sliding engagement of the two portions 170 and 175 of housing 130.

'762 Patent at 4:46-60.  The '762 Patent contemplates that the guides 810 interlock or mesh with female rail 190, and the opposing notches 820 interlock or mesh with male rail 180.

Defendants proposed construction which includes "connected" improperly broadens the scope of the '762 Patent as it would allow any kind of connection.  For example, under this proposed construction, a rail can rest upon a guide and still be connected and slidable.  This is not within the scope of the '762 Patent as it requires an interlocking or meshing between the first set of rails and second set of rails by some component, in this case guide/notches and rails.

As such, this Court should adopt Plaintiffs' proposed construction and reject Defendant's construction which is improperly broadens the terms and is inconsistent with the spirit of the '762 Patent.

### E.    "COUPLED TO"

| Plaintiffs | Defendant |
|---|---|
| directly connected to | Plain and ordinary meaning |

The Court should construe this term and adopt Plaintiffs' proposed construction for the term "coupled to" to avoid any attempt by Defendant to suggest to the jury that "coupled to" does not require a direct connection.

The term "coupled to" is found in and used in the same manner in claims 1 and 9, reproduced in part: "…a first pair of rails *coupled to* the first side and a second pair of rails *coupled to* the second side… a tensioning member *coupled to* the first side and the second side… a first engagement portion *coupled to* the first side and a second engagement portion *coupled to* the second side…" (emphasis added). The claim language uses the term "coupled to" to indicate the connection of pairs of rails, a tensioning member, and engagement portions to sides of the accessory display device. The question becomes if said connections must be direct or indirect. An ordinary definition of "coupled to" must be direct in view of the intrinsic and extrinsic records.

17

Throughout the specification the term "coupled to" is used to demonstrate the direct connection of aspects of the accessory display device to each other. For example, "Referring to FIG. 1, a computer display accessory 100 is depicted coupled to a laptop computer 110." '976 Patent, 2:38-39. Various types of coupling means are even explicitly listed: "These tensioning members (140) may be coupled to housing portions 170 and 175 in any of a variety of ways including but not limited to with glue, by melting, by tying or sewing, by clipping, etc." *Id.,* 3:4-7 (annotated). All of the usages of the term require direct connections.



FIG. 1



FIG. 2

18

Similarly, the specification on occasions uses the terms "affixed" and "attach" in lieu of "coupled to" for the same discussions.  Such as, "[o]nce housing 130 is affixed to a computer or other display…" *Id.,* 3:28-29.  Further, "Any of a variety of ways may be used to attach the tensioning member to the two housing portions without departing from the scope of the invention." *Id.,* 3:12-15. Such verbiage carries a connotation of direct connection.

The specification goes on to further define "coupled to" as a manner that is secure: "Also, it should be noted that embodiments of the accessory device are designed to couple to the display device… in a manner that is secure enough to carry the laptop computer with the accessory device attached thereto." *Id.* 3:65-42. As such, this requires a direct connection.

As evidenced by the specification and relevant figures, whether it be a rail, a tensioning member, or a first engagement portion coupled to a side, "coupled to" must be consistently construed as a direct connection.

## VII.    CONCLUSION

For the foregoing reasons, Plaintiffs' proposed claim constructions should be adopted and Defendant's proposed constructions rejected.

DATED: September 27, 2022          Respectfully submitted,

*/s/ Hao Ni*

Hao Ni
Texas Bar No. 24047205
hni@nilawfirm.com
Nicholas Najera
Texas Bar No. 24127049
nnajera@nilawfirm.com

NI, WANG & MASSAND, PLLC
8140 Walnut Hill Lane, Suite 500
Dallas, Texas 75231
Tel: (972) 331-4600
Fax: (972) 314-0900

*ATTORNEYS FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of September, 2022, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Hao Ni*
Hao Ni

20